Filed 3/25/21  In re A.C. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| In re A.C. et al., Persons Coming Under the Juvenile Court Law. | C092444 |
| YOLO COUNTY HEALTH AND HUMAN SERVICES AGENCY,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>R.C.,<br><br>Defendant and Appellant. | (Super. Ct. Nos. JVSQ193242, JVSQ193243) |

Mother, R.C., appeals from the juvenile court's six-month review order concerning her children A.C. and Z.C., arguing:  (1) the Yolo County Health and Human Services Agency's (Agency) failure to provide mother with reasonable visitation precludes the court's reasonable service and reasonable efforts findings; (2) the court's minimal progress finding should be reversed for the same reason; (3) the juvenile court

1

improperly delegated to the minors the power to determine whether visitation would occur and abused its discretion in providing visits with Z.C. would continue via Zoom; and (4) the juvenile court erred in limiting mother's educational rights without "a concrete reason why such a limitation was necessary."

We concur that the juvenile court erred in ordering visitation that was expressly subject to the wishes of the minors and limiting mother's education rights as to Z.C. only. Because the visitation order has already been modified, we will remand for further proceedings to determine whether it was necessary to limit mother's educational rights as to Z.C. only. We otherwise affirm the judgment.

FACTS AND PROCEDURAL HISTORY

*The Petition and Detention*

On October 21, 2019, the Agency filed a Welfare and Institutions Code section 300 (statutory section references that follow are to the Welfare and Institutions Code unless otherwise stated) petition alleging A.W. (age 17), A.C. (age 14), and Z.C. (age 8) had suffered or were at substantial risk of suffering serious physical harm caused by mother's physical abuse of the minors (§ 300, subd. (a)). It alleged mother hit A.W. with a closed fist and a hanger on October 16, 2019, causing significant bruising on A.W.'s face, ear, and to the back of her neck. A.C. and Z.C. witnessed this incident. All minors individually feared returning to mother's home and reported that "mother routinely hits them with a whip, a hanger, a brush, or her closed fists." A.W. feared mother would kill her. Mother's short temper and threats of physical punishment as well as physical punishment put the minors at risk of injury. Mother also withheld food as a punishment. The Agency expressed concern about the level of mother's violence, as well as her lack of insight into the impact of this ongoing violence in the home. This petition was amended after the minors' detention to include allegations of mother's failure to protect A.C. and Z.C. (§ 300, subd. (b)(1)).

2

The severity of the incident resulting in Agency intervention was underscored in the detention report, which reflected mother beat A.W. because of an argument over the television, hitting her across the face with a hanger (ultimately breaking it on her), throwing a cup at her, and then climbing on top of her and punching her repeatedly on the head. Two doctors diagnosed A.W. with "post-concussive syndrome" as a result of the beating. A.W. worried her mother truly wanted to hurt her and might kill her given mother's reported dreams wherein she did just that. She reported that mother coerced her siblings to lie about their physical abuse and cover up their bruises.

A.C. and Z.C. confirmed witnessing the altercation between A.W. and their mother. Both minors confirmed mother physically hit them, relaying specific instances of abuse involving fists or a whip. Marks were observed on Z.C.'s back. Mother told Z.C. to hide signs of his abuse, which he did with clothes. Maternal grandparents were aware of the abuse and tried unsuccessfully to intervene.

Mother took medicine for social anxiety, but denied mental health or substance abuse problems. Mother denied hitting the minors with a closed fist, a hanger, a whip, or a brush. Mother admitted to spanking A.W. and taking away her phone. She also admitted her children were scared of her, but denied that any of the injuries observed on the minors were because of her, instead providing ambiguous explanations that the injuries occurred at school or during sports. Mother denied she intended to threaten A.W. by telling her about her dream.

All minors reported being afraid of mother at their first visitation and displayed signs of fear through facial expressions and body language. A.C. and Z.C. acquiesced to mother's request for a hug, but A.W. refused.

The minors were detained at the hearing on October 22, 2019. The juvenile court ordered mother receive three hours a week of supervised therapeutic visits to begin after the minors were enrolled in therapy and after mother enrolled in anger management and/or individual counseling. The court awarded the Agency authority to accelerate

3

visitation as appropriate.  A combined jurisdiction and disposition hearing was set for November 26, 2019.

At the November 26, 2019 hearing, the juvenile court continued the contested jurisdiction/disposition hearing until December 19, 2019.  The contested jurisdiction/disposition hearing was continued again until January 13, 2020, in light of mother's desire to retain private counsel.

### *Jurisdiction and Disposition*

The December 19, 2019, jurisdiction and disposition report recommended the juvenile court sustain the allegations of the amended petition for all minors and grant A.W.'s father full legal custody of her.  The report further recommended the court declare A.C. and Z.C. dependents and provide reunification services to mother.  In addition to the facts supporting detention, the report also described an incident where mother hit A.W. in the face with a pan.  Mother admitted striking A.W. with a hanger on one occasion and threatening all three minors with a hanger and whip.  Mother also admitted to open hand spanking A.C. and Z.C. on their bottoms.

The social worker spoke with Z.C., who confirmed his previous statements of mother's physical abuse, which he said occurred " 'a lot,' " but clarified that he had only heard his mother's confrontation with A.W.  Z.C. told his maternal grandparents mother hit him, and they told him to obey mother.  Z.C. was glad everyone was engaged in counseling and thought things would be safer at home if mother received treatment for her anger.  Z.C. later said that he wanted to go home and planned to stay safe by not upsetting mother.

A.C. disclosed mother had been physically abusing her for a number of years (using a hanger, whip, and spatula) and that A.C. did not think she would be safe living with mother.  Maternal grandparents' home would also not be safe, because they "would

4

not hold boundaries with her mother." She also disclosed receiving a text from her mother before the interview that stated, " 'don't lie for [A.W.]' "

Mother denied her abusive behavior at her November 1, 2019, meeting with the social worker, complaining about the previous social worker and downplaying the incident. Mother accused A.W. of making up the allegations for personal reasons. Mother initially denied hitting with a fist, brush, or hanger, stating she only threatened spanking and sometimes used curse words. However, mother later admitted using a hanger for discipline approximately two times per month, but denied leaving marks. She also admitted hitting A.W. on the back with an open fist. Mother denied ever withholding food. When confronted with the minors' statements, mother agreed it was a problem that the minors feared her. Mother agreed to obtain mental health services and parent education, the first of which she was already receiving.

Mother met with the social worker again on November 8, 2019, arguing Z.C. and A.C. should be immediately returned because there was no proof supporting the allegations. When confronted with that proof (including her own previous admissions), mother protested that "she did not leave any marks nor injuries." Mother refused to discuss prior reports that she had been subject to psychiatric holds under section 5150 in 2008 and 2012 and denied that she had any current mental health problems.

Mother's request to select and arrange counseling for the minors was denied. The social worker worked diligently to secure therapists for the children and initiate therapy so that the clinicians would be enabled to make recommendations regarding the ordered therapeutic visitation. This process was difficult and complicated by Z.C.'s escalating behaviors, necessitating Z.C.'s enrollment in WRAP services. The social worker kept mother informed of this progress. A.C. was receiving counseling, although her therapist recently switched because of a conflict. Both A.W. and A.C. separately stated a preference not to visit their mother or their grandparents. Mother consistently requested

5

visits with the minors and wrote letters to them. A.C. and A.W. refused mother's letters, but Z.C. accepted his letter and wrote back.

The Agency referred mother for counseling, anger management, and parenting classes, which mother had started. According to the head of mother's anger management program, Bobby Stewart, mother denied abusing her children and portrayed herself as a victim. "[M]other appears to have deep denial about her anger issues, struggles with managing anger and has not admitted any behaviors or issues where she has struggled with managing her anger or frustration." Mother was engaged in weekly therapy with Melissa King, MFTI, but the social worker had not been able to communicate with King regarding mother's progress. The Agency further recommended that mother undergo a psychological assessment given her "denial and current decision-making."

In light of this information, the Agency recommended against immediately returning the minors to mother, who continued to be in deep denial of her actions and the corresponding effects on her children. The Agency also recommended against returning the minors to the maternal grandparents: (1) who were aware of the minors' abuse, but failed to act to protect them; (2) who had struggled to follow visitation guidelines, whispering to the children and making promises; and (3) with whom neither A.W. nor A.C. wanted to live. The Agency recommended declaring A.C. and Z.C. dependents and maintaining them in their out-of-home placements, which was a foster home for A.C. and a group home with WRAP services for Z.C.

At the January 13, 2020, contested jurisdiction and disposition hearing, mother waived her right to testify and present evidence, electing to submit on the petition. The court sustained the petition under both section 300, subdivisions (a) and (b). The court awarded full legal custody of A.W. to her biological father and dismissed the case as to A.W. only. As to A.C. and Z.C., the court adopted the findings and orders prepared by the Agency for disposition and set the matter for six-month permanency planning on

6

May 4, 2020. The goal of the case plan was reunification with mother. Mother's visitation order remained the same.

Mother's case plan directed her to obtain a psychological assessment to determine which mental health services would be best for her. The plan also directed mother to participate in transparent individual counseling to identify what may be impairing her ability to safely parent. This included that mother "develop an understanding of what constitutes physical and emotional abuse, identify how her past behaviors have impacted her children's physical and emotional health and safety, and coping skills to effectively manage frustration and anger in a healthy, nonthreatening, [and] positive manner." Mother was directed to openly and honestly participate in an anger management/domestic violence program for the same reason. Finally, mother was directed to participate in parent education classes to obtain the skills necessary to parent without being physically and emotionally abusive.

Mother did not appeal this decision.

### *The Six-Month Review*

Following continuances: (1) on the juvenile court's own motion due to COVID-19, (2) because of mother's request due to her change of counsel, and (3) because of mother's request to get paperwork together, the contested six-month review hearing was held on August 3, 2020. Leading up to this hearing, the Agency submitted a six-month review report (filed April 30, 2020) and supplemental report (filed June 25, 2020), which recommended against the return of the minors and for an additional six months of reunification services.

The Agency reported, mother was on pre-trial release pending three charges of infliction of corporal injury on a child (Pen. Code, § 273d, subd. (a)) and three charges of abusing or endangering the health of a child (Pen. Code, § 273a, subd. (a)). Her probation officer was satisfied with her performance on release, but relayed mother's lack

7

of interest in that officer's discussion encouraging mother to take responsibility for her actions, as opposed to merely participating in her court mandated CPS services.

Mother completed her parent education classes, although her instructor Nancy Chavez, opined that mother should engage in more classes to further her understanding of "the importance of listening to her children and practicing safe discipline techniques." Ms. Chavez recommended mother "engage in counseling services to increase her insight on the impact of her abuse on her children, take responsibilit[y] for her actions and work through her own possible mental health issues."

Similarly, mother's first anger management instructor, Bobbie Stewart, reported that mother made minimal progress and needed to continue taking classes "to work on accountability, taking responsibility, gain insight as to her issues and why her children were removed from her care." While mother attended classes with limited participation, she continued to deny she physically abused her children and accused her daughter of lying. Stewart also worried whether mother suffered from mental health issues that needed to be addressed. Ultimately, mother failed to successfully complete this program, despite having attended 42 sessions, because mother refused to accept responsibility for her actions requiring her treatment and failed to meaningfully participate in groups.

Mother's second anger management instructor, Myrna Brady, confirmed mother's enrollment and participation in anger management classes consisting of an online assessment and workbook exercises. She also reported that mother did not provide her court documents or mother's case plan. Repeated efforts to obtain a release of information to provide Ms. Brady with the relevant information were unsuccessful.

Mother reported engaging in counseling since October 25, 2019, with Vanessa King, MFTI, but numerous attempts to contact King to obtain information were unsuccessful until June 2020. King reported that mother was learning new skills through therapy, but continued to deny physically abusing her children.

8

At a February 26, 2020, meeting with mother to discuss her case plan, reunification timeline, and services, etc., mother stated she would not complete her psychological evaluation with the referred provider, although she could not say why. Mother refused assistance in locating another provider and acknowledged receipt of the requirements for any psychologist and examination.

Thereafter, mother hired psychologist Amy Kline in March to conduct the assessment, but despite repeated requests of mother and Ms. Kline, the social worker was not able to obtain a release of information so that Kline would have the Agency information relevant to the court ordered examination. Ms. Kline also displayed questionable professionalism and impartiality because Kline had met with mother five times prior to contacting the Agency and made statements indicating a bias in mother's favor in communications with the social worker. Due to these concerns, Agency counsel contacted mother's counsel to warn that Ms. Kline's work as then being conducted would not comply with the case plan. Counsel provided contact information for two different providers for mother to choose from to complete her court ordered assessment.

Rather than heeding the Agency's warning, mother submitted a May 23, 2020 evaluation from Dr. Kline, which was prepared without the benefit of any information from the Agency and which did not discuss the minors' reported abuse by mother, nor mother's ongoing denial of those reports. According to this report, mother suffered from anxiety and dependent personality disorder with avoidant personality traits and obsessive compulsive personality features. The Agency told mother and her counsel that Kline's report failed to satisfy the case plan and directed mother participate in the court ordered evaluation with one of two proffered providers.

According to the Agency, A.C. was doing well at her placement and school. She began therapy in December 2019, wherein she worked on processing her trauma as well as learning self-awareness and relaxation techniques. Both A.C. and her therapist agreed she should continue her treatment. A.C. felt happy, stable, and comfortable at her

9

placement.  Notably, A.C. exhibited distress following a CASA visit wherein her CASA worker repeatedly told her that mother loved her, resulting in reassignment of that worker.

Z.C. began individual therapy in December 2019, had successfully completed WRAP services, was doing better in school, and his behavioral issues (including tantrums wherein Z.C. kicked/hit others and/or destroys others' property) were decreasing.  In light of this, the Agency moved Z.C. from a group home to a therapeutic foster home on June 22, 2020.  Z.C. was starting to open up regarding mother's physical abuse, which he had disclosed to his therapist, as well as group home staff, but had been unable to therapeutically discuss.  Z.C. was diagnosed with posttraumatic stress disorder and mild oppositional defiant disorder.  He suffered from nightmares, negative moods, and a refusal to forgive unless the offending individual was first punished.  Z.C.'s therapist discussed his reports of abuse with mother, who denied the abuse, accused Z.C. of lying, and demanded to question him about his reports.  Z.C. volunteered a preference to live with maternal grandparents, rather than mother.

Mother diligently visited Z.C., but had had no visits with A.C.  Further information regarding visitation will be discussed, *post*.

At the six-month review hearing on August 3, 2020, the Agency presented the testimony of Christiana Ebere, the social worker, that the Agency recommended six more months of reunification services.  Ebere testified that mother engaged in a pattern of participating in services, but failing to fully disclose the reason for the services, thus precluding a focus on the issues that mother needed to address in order to be successful with her services.  Ebere also had difficulty communicating with mother, who refused to speak over the phone without recording the conversations and demanded that communication be in e-mail.  However, mother's e-mail communication was one-sided, with mother contacting Ebere when she wanted something, but failing to respond to or even acknowledge Ebere's e-mails.

10

Ebere reiterated mother's failures to comply with the case plan requirements as previously described in the reports, including her failure to obtain a qualifying psychological evaluation, her failure to acknowledge that she had abused the minors, her failure to take responsibility for her actions in anger management resulting in her discharge from her first anger management program, and her failure to provide her successive anger management provider information concerning the need for services and cooperate in obtaining releases so that such information could be shared. Mother's parenting class provider was concerned that mother may be suffering from untreated mental health issues.

Ebere confirmed checking with A.C. monthly regarding visits with her mother, but that A.C. had refused such visits. Z.C. struggled with Zoom visits with mother, often having tantrums after being told it was almost time for visits. Z.C. continued reporting mother's abuse and expressed fear that if he was returned home, the abuse would resume and mother will hide it so that no one would know. Given mother's lack of progress, continued denial of the reason for CPS intervention, possible mental health problems, and the minors' ongoing fear of mother, Ebere opined it would be detrimental to return the minors to mother.

No further testimony was presented. Mother's counsel argued for the immediate return of Z.C. and for therapeutic visits to immediately commence with A.C. so that she could be transitioned home as soon as possible. Counsel continued that mother had diligently complied with her case plan by completing the psychological evaluation, anger management, and parenting classes. Further counsel complained that the true issues associated with Z.C.'s visits with mother was the Zoom medium, not mother herself, and that he should be immediately returned to her so that she could demonstrate what she learned from her services.

Z.C.'s counsel vehemently objected to his being returned to mother, highlighting that mother still denied the abuse occurred and had avoided real progress in her court

11

ordered services. The Agency argued it was unquestionable that there would be a meaningful risk to the minors if returned to mother, that mother had not meaningfully participated in services, and that mother should be ordered to participate in a psychological evaluation with Dr. Wilkenfield. The Agency continued that the minors consistently maintained that mother abused them, and mother persisted in saying the children are lying. The Agency recommended six more months of services.

Thereafter, the court found by clear and convincing evidence that returning the minors to "mother would create a substantial risk of detriment to their safety, protection, or physical or emotional well-being." The court reasoned that mother had made minimal progress even though she was taking classes because she failed to take responsibility for her actions and continued asserting that the minors (who feared her) were lying. The court ordered mother to comply with her case plan, including the execution of all necessary releases of information and that mother participate in the psychological evaluation with Dr. Wilkenfield. The court further found the Agency had complied with the case plan and made reasonable efforts to return the minors, but that mother had "only made minimal progress towards alleviating and mitigating the causes necessitating placement." The court adopted the Agency's recommended findings and orders and set the case for 12-month review on December 22, 2020. Mother timely appealed.

DISCUSSION

I

*The Agency Provided Mother Reasonable Services*

Mother does not challenge the adequacy of Agency plans to treat the issues requiring the removal of her children by requiring that she participate in and referring her for a psychological evaluation, parent education, anger management, and individual counseling. Nor does she challenge the Agency implementation of these services. Rather, she challenges whether she received adequate visitation with A.C. and Z.C.,

12

arguing the lack of visitation precluded the juvenile court's reasonable services finding. The Agency disagrees, arguing substantial evidence supports the juvenile court's finding. We will address mother's arguments as to each minor in turn and find the evidence supports the finding that the Agency provided reasonable visitation under the circumstances.

A. *The Applicable Law*

"Family reunification services play a critical role in dependency proceedings. (§ 361.5; [citations]; see 42 U.S.C. § 629a(a)(7).) At the dispositional hearing, the court is required to order the agency to provide child welfare services to the child and his or her parents. (§ 361.5, subd. (a).) Services 'may include provision of a full array of social and health services to help the child and family and to prevent reabuse of children.' (§ 300.2.) Reunification services should be tailored to the particular needs of the family." (*In re M.F.* (2019) 32 Cal.App.5th 1, 13.) Visitation is an essential component of any such services provided pursuant to the reunification plan. (*In re Alvin R.* (2003) 108 Cal.App.4th 962, 972; accord, *In re M.F.,* at p. 16.)

"At each review hearing, if the child is not returned to his or her parent, the juvenile court is required to determine whether 'reasonable services that were designed to aid the parent . . . in overcoming the problems that led to the initial removal and the continued custody of the child have been provided or offered to the parent . . . ' (§§ 366.21, subds. (e)(8) & (f)(1)(A), 366.22, subd. (a).) The 'adequacy of reunification plans and the reasonableness of the [Agency's] efforts are judged according to the circumstances of each case.' [Citation.] To support a finding that reasonable services were offered or provided to the parent, 'the record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained reasonable contact with the parents during the course of the service plan, and made reasonable efforts to assist the parents in areas where

13

compliance proved difficult . . . .' " (*In re M.F., supra*, 32 Cal.App.5th at pp. 13-14.) The services provided do not have to be the best services that could have been provided, rather they must have been reasonable under the circumstances. (See *Elijah R. v. Superior Court* (1998) 66 Cal.App.4th 965, 969 [citing *In re Misako R.* (1991) 2 Cal.App.4th 538, 547].)

The standard to be applied to a reasonable services determination under section 366.21, subdivision (e)(8) where services to the parent are continued is unclear. The statute does not say. (See 1 Seiser & Kumli, Cal. Juvenile Courts Practice and Procedure (2020) Part I Analysis, § 2.152 [noting where a § 366.26 hearing is not set, § 366.21, subd. (f)(1)(A) does not specify which standard applies].) Under these circumstances, the preponderance of the evidence standard normally applies. (See *Katie V. v. Superior Court* (2005) 130 Cal.App.4th 586, 594 [citing Evid. Code, § 115].) However, assuming without deciding that a clear and convincing evidence standard applies, we still find substantial evidence supports the juvenile court's order.

As recently explained by our high court: "When reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true. In conducting its review, the court must view the record in the light most favorable to the prevailing party below and give appropriate deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011-1012.)

B. *Analysis*

Because of the severity of the abuse and the minors' trauma as demonstrated at mother's first supervised visit, the court ordered therapeutic visitation only after the

minors were enrolled in individual counseling and mother enrolled in anger management and/or individual counseling. Mother did not object to this order entered at the detention hearing on October 22, 2019.

The social worker acted diligently, and the minors were enrolled in individual counseling by the originally scheduled disposition hearing on November 26, 2019. While mother complained that she had not yet had any visits, the social worker explained that the parties were waiting on word from the minors' counselors that they were ready to begin those therapeutic visits. Mother was reminded that she could file a noticed motion if she wanted to change the court's order, and the visitation order remained in place as previously entered.

Mother's visitation order remained the same following the contested jurisdiction and disposition hearing on January 13, 2020 (three hours per week supervised), recognizing that therapeutic visits with A.C. would only occur once cleared with her therapist. Mother's counsel confirmed, "Just to be clear, so it's between the therapist, the Department and [A.C.] as to when the visits will commence with the idea is hopefully soon." A.C.'s counsel clarified, "Consulting [with] the therapist . . . and I will ask for them to consult me as well." Mother's counsel did not object to this arrangement, stating: "Thank you."

### 1. Visitation with Z.C.

Following this hearing, mother diligently visited Z.C. in person and later via video chat as scheduled. These video chats were up to three hours once a week, but had to be reduced to one hour a week after Z.C. complained that he was "overwhelmed with all the video telephone call visitations." Z.C. was displaying signs of anxiety and acting out. He sometimes shut down during visits and refused to participate. On one occasion, mother became upset when Z.C. tried to cut a video call short to go to the park. Mother called the police complaining that Z.C. was in danger due to coronavirus, resulting in

15

Z.C.'s exclusion from park outings. Z.C. requested help informing his mother that he wanted shorter visits. He was afraid to tell mother he did not want to visit, and when Z.C. attempted to cut visits short, mother ignored his efforts. The reduction in video visits also applied to grandparents and his siblings, which could be increased upon Z.C.'s request.

Mother complains she was not afforded make-up visits and should not have been forced to continue with online visitation following the end of Yolo County's stay-at-home order. However, she has not shown that it was unreasonable given the considerations of the ongoing COVID-19 epidemic for the Agency to continue her *supervised* visits in an online medium, nor did she seek relief from the court for any perceived deficiency arising from the manner of those visits.

"On March 4, 2020, due to the outbreak of the COVID-19 virus, Governor Gavin Newsom declared a state of emergency. On March 11, 2020, the World Health Organization (WHO) declared COVID-19 a pandemic. On March 19, 2020, Governor Newsom issued an executive order directing all Californians not providing essential services to stay at home." (*In re M.P.* (2020) 52 Cal.App.5th 1013, 1016.) Likewise, on March 18, 2020, Yolo County issued a shelter-in-place order,[1] ordering individuals to stay home because one of the known ways to prevent the spread of COVID-19 is "to limit interactions among people to the greatest extent practicable." In recognition of the ongoing crisis, the Judicial Counsel promulgated an emergency rule meant to address visitation in juvenile dependency proceedings, which would expire 90 days after the lifting of the state of emergency related to COVID-19. (See *In re M.P.,* at p. 1017; Cal.

---

[1] We grant mother's request for judicial notice of this order, but find it unnecessary to take judicial notice of the Yolo County April 30, 2020, press release also attached to mother's request.

16

Rules of Court, appen. I [Emergency Rules Related to COVID-19], rule 6(d).) However, the COVID-19 state of emergency endures.

Emergency Rule 6(c)(7) states in pertinent part, "During the state of emergency related to the COVID-19 pandemic, previously authorized visitation must continue, but the child welfare agency is to determine the manner of visitation to ensure that the needs of the family are met. If the child welfare agency changes the manner of visitation for a child and a parent or legal guardian in reunification, . . . the child welfare agency must notify the attorneys for the children and parents within 5 court days of the change. All changes in manner of visitation during this time period must be made on a case by case basis, balance the public health directives and best interest of the child, and take into consideration whether in-person visitation may continue to be held safely. Family time is important for child and parent well-being, as well as for efforts toward reunification. Family time is especially important during times of crisis."

This rule authorized an attorney for a minor or parent to seek modification of the changed manner of visitation and made clear that the moving party bears "the burden of showing that the change is not in the best interest of the child or is not based on current public health directives." (Cal. Rules of Court, appen. I, Emer. Rule 6(c)(7)(A).)

Even assuming, as mother now argues, that "better" visitation, such as visits in an outdoor fora, could have been provided at some point, perfection in services is not required. (*Elijah R. v. Superior Court, supra*, 66 Cal.App.4th at p. 969; *In re Misako R., supra*, 2 Cal.App.4th at p. 547.) Emergency Rule 6 expressly authorized the Agency to modify the manner visitation, taking in consideration the public health directives, best interest of the child, and safety considerations. (Cal. Rules of Court, appen. I, Emer. Rule 6(c)(7).) We are unconvinced that the record shows that the Agency failed to abide by this directive. Nor are we convinced by mother's argument in her reply brief that the Agency's alleged failure to notify her counsel within five court days that it was acting pursuant to its emergency authority provides additional support for mother's argument

17

that she was not afforded reasonable reunification services because she was denied due process and an opportunity to be heard. It is undisputed that mother failed to challenge the Agency's decision to require virtual visits via the emergency rules (Cal. Rules of Court, appen. I, Emer. Rule 6(c)(7)(B)) or via a noticed motion for specific enforcement of her court ordered visitation. In the absence of such complaint, and in light of the reasonable visitation services provided, the record does not show the Agency abused its discretion to set the manner of visitation.

Further, mother's argument that she should have been provided make-up visits ignores that her right to visitation may be curtailed in light of the "well-being" of Z.C., who was clearly distressed by his three hour long virtual visits with mother, as shown by his acting out prior to visits and refusal to participate in those visits. (See *Serena M. v. Superior Court* (2020) 52 Cal.App.5th 659, 673 ["visitation must be as frequent as possible, consistent with the well-being of the child"]; § 362.1, subd. (a)(1)(A).) Thus, it was reasonable for the social worker and Z.C.'s caregiver to limit his online visitation time on a weekly basis. Under those circumstances, it is clear that additional visits to "make-up" any time lost in the shorter visits would not have been in Z.C.'s interest, and thus, it was reasonable to refuse them.

### 2. Visitation with A.C.

Mother argues the Agency failed to make reasonable efforts to overcome A.C.'s opposition to visiting. Mother had no visits with A.C. in this reporting period because A.C. continued to refuse such visitation, affirming her choice in monthly meetings with the social worker. A.C.'s therapist confirmed that A.C. had not indicated she wanted to visit with mother. Mother had been previously advised of her right to request a change order, but did not request a different visitation order or enforcement of the court's prior order for a three-hour supervised therapeutic visit each week. (See *In re Sofia M.* (2018) 24 Cal.App.5th 1038, 1046 [when child cannot be persuaded to visit pursuant to a

18

lawfully issued visitation order, it is incumbent upon the parent to move for juvenile court intervention].)

However, as of the June 29, 2020 addendum, A.C. had recently expressed interest in a face-to-face therapeutic meeting with mother so that A.C. could tell mother how mother's actions impacted and continued to impact her. The social worker coordinated with both A.C.'s and mother's therapists regarding such a meeting, and mother's therapist indicated pre-meeting coaching with mother would be required so that mother would be able to "stay in her space, stay present and absorb what her child is going to say to her." While, A.C. was concerned about signing a release so information could be shared with mother's therapist because she worried such information might be disclosed to mother, there is no indication this concern prevented the meeting.

Thus, here, A.C. who had been in therapy since late 2019, had finally progressed to a point in June of 2020 where she was ready to contemplate a therapeutic session with her mother. Mother complains that this session had not occurred as of the August 3, 2020 six-month status hearing. However, we do not find the delay in setting up this meeting unreasonable. On the contrary, mother's own therapist requested time to prepare mother for this difficult meeting. Given mother's continuing denial that she had physically abused her children, it is manifestly reasonable that mother required coaching before meeting with A.C. to discuss that abuse and its impact on A.C. The reasonable efforts by A.C.'s social worker as outlined above distinguishes this matter from *In re Alvin R., supra*, 108 Cal.App.4th at pages 972-973, where the social worker's failure to timely aid the family in securing individual therapy and apparent ignorance of successive orders seeking to facilitate therapeutic visitation precluded a finding of reasonable services. We, therefore, conclude that substantial evidence supports the juvenile court's finding that reasonable services were provided to mother.

19

## II

### *Mother's Minimal Progress*

Mother complains the Agency's lack of reasonable visitation services invalidates the juvenile court's determination that she had made only minimal progress towards eliminating the need for the minors' placement. At each six-month review hearing the juvenile court must determine: "The extent of progress that has been made toward alleviating or mitigating the causes necessitating placement in foster care." (§ 366, subd. (a)(1)(E).) Having previously rejected mother's challenge to the visitation services provided her, we highlight the substantial evidence supporting the court's minimal progress finding. (See *J.H. v. Superior Court* (2018) 20 Cal.App.5th 530, 535 [progress finding is evaluated by substantial evidence standard].)

Mother failed out of her first anger management program, despite having attended 42 sessions, because mother refused to accept responsibility for her actions requiring her treatment and failed to meaningfully participate in groups. Her instructor reported mother's minimal progress and continuing need "to work on accountability, taking responsibility, gain insight as to her issues and why her children were removed from her care." While mother attended classes with limited participation, she continued to deny she physically abused her children and accused her daughter of lying. Stewart also worried whether mother suffered from mental health issues that needed to be addressed.

Mother failed to sign the releases necessary to provide her second anger management instructor with the Agency information necessary to assure mother was receiving targeted treatment, which had consisted of an online self-reported assessment and workbook exercises. While mother had learned some new skills through individual therapy, mother's therapist reported her continued denial of any physical abuse of her children.

20

Further, while mother completed her parent education classes, her instructor worried that mother needed more classes to further her understanding of "the importance of listening to her children and practicing safe discipline techniques" and that mother needed to "engage in counseling services to increase her insight on the impact of her abuse on her children, [and] take responsibilit[y] for her actions." This provider worried that mother was suffering from untreated mental health issues. Mother was also ordered to participate in a psychological evaluation, but knowingly failed to obtain a psychological evaluation that would comply with her case plan.

Moreover, the Agency had difficulty communicating with mother, who refused to speak over the phone without recording the conversations and demanded that communication be in e-mail. However, mother's e-mail communication was one-sided, with mother contacting the social worker when she wanted something, but failing to respond to or even acknowledge the social worker's e-mails. Mother further engaged in a pattern of participating in services, but failing to fully disclose and/or inaccurately disclosing the reason for the services, thus precluding a focus on the issues that mother needed to address in order to be successful with her services.

It was against this backdrop that the juvenile court found mother had made minimal progress even though she was taking classes because she failed to take responsibility for her actions and continued asserting that the minors (who feared her) were lying. Substantial evidence supports the juvenile court's finding. (*J.H. v. Superior Court, supra*, 20 Cal.App.5th at p. 535.)

### III

*The August 3, 2020 Visitation Order*

Mother complains the juvenile court's August 3, 2020, visitation order from the six-month review hearing is in error because: (1) she should have been allowed to visit with Z.C. in person and (2) the court improperly delegated its power to determine

21

mother's rights to visitation under *In re S.H.* (2003) 111 Cal.App.4th 310 and *In re Julie M.* (1999) 69 Cal.App.4th 41. Mother requests we remand the matter so that the juvenile court may conduct a new visitation hearing.

At the six-month review hearing, Z.C.'s counsel argued for all visits with Z.C. to be via Zoom. Counsel explained he was placed in a foster home with a high-risk family member and that family had already lost another family member to COVID-19. Further, Z.C. was doing well in this placement, necessitating the Zoom visitation. Counsel further requested that the number of visits between Z.C. and A.C. increase, that the number of visits with mother be reduced, that Z.C. be allowed to decide whether he wanted to visit mother, and that he should not be forced to visit. The Agency had no objection to these requests. Mother's counsel objected for the record: (1) that mother requested in-person visits, (2) to discretion for visits not to occur, and (3) requested as many visits as possible. Mother complained the quality of visits with Z.C. would improve if conducted in person where he could not get distracted or avoid the video visit.

The court ruled, "I do think all visitation for both [A.C.] and for [Z.C.], is completely up to them. If they don't want to visit with Mom, they don't have to. I'm not going to force either one of those children to visit with their mother if they don't want to." Z.C.'s visitation would continue on Zoom. That the minors would be allowed to choose whether to visit with mother was further reflected in the court's minute order which stated, "visits with mother *are by children's choice*." (Italics added.)

The juvenile court altered this visitation order on October 22, 2020, ordering that A.C. would not have any visits with mother because those visits would be detrimental.[2] Also on October 22, 2020, the court ordered mother would have one hour per week of Zoom visits with Z.C., which could transition to in-person visits providing they could be

---

[2] We grant respondent's request for judicial notice of the Yolo Court's October 22, 2020 minute order.

safely conducted.  Further, visits could increase following consultation with Z.C.'s counsel.

Mother has failed to persuade us that the juvenile court abused its discretion in ordering that mother's visits with Z.C. should continue via Zoom.  Z.C. was successfully stepped down into a therapeutic foster home with a high-risk family member and a recent death in the family due to COVID-19.  We see no abuse in the juvenile court balancing mother's desire for in-person visits with the dangers associated with the pandemic and Z.C.'s interest in maintaining his placement.  (See *In re R.R.* (2010) 187 Cal.App.4th 1264, 1284 [court's visitation order balancing the rights of parent with well-being of minor is reviewed for an abuse of discretion].)

However, we do concur that a visitation order giving A.C. and Z.C. *sole discretion* to determine whether *any visits* with mother would occur was error.  (See *In re S.H., supra*, 111 Cal.App.4th at pp. 317-320 and *In re Julie M, supra*, 69 Cal.App.4th at pp. 48-51.)  Nonetheless, we find it unnecessary to remand for the requested visitation modification hearing because it appears that such a hearing has already taken place and the erroneous express conditioning of visits upon the will of the minors was removed. Accordingly, there is no need to remand for a visitation modification hearing, even though it is proper for this court to identify the error given its potential to impact future proceedings in this matter.  (See, e.g., *In re Dylan T.* (1998) 65 Cal.App.4th 765, 769-770 [mother's release from jail did not moot challenge to juvenile court order denying mother visitation in support of reunification while incarcerated]*; In re C.C.* (2009) 172 Cal.App.4th 1481, 1488-1489 [addressing mother's complaints concerning order denying visitation where that visitation was later restored because the original order could impact subsequent proceedings in the case].)

23

IV

*Mother's Educational Rights*

Mother complains the juvenile court's order limiting her educational rights and vesting educational rights for both A.C. and Z.C. in their caregivers and CASA workers was error. Section 361, subdivision (a)(1) authorizes the juvenile court to limit a parent's educational rights to a minor child as "necessary to protect the child" and only "in the best interests of" that child. We review the juvenile court's order limiting mother's education rights for an abuse of discretion. (*In re R.W.* (2009) 172 Cal.App.4th 1268, 1277.) We discern no error in limiting mother's educational rights as to A.C., but we must reverse the order limiting mother's educational rights as to Z.C.

The limitation of educational rights was addressed at the six-month review hearing, but only as to A.C. While the court had originally indicated there was no reason to limit mother's educational rights to the minors, the Agency thereafter requested A.C.'s educational rights be granted to her current caregivers or shared in light of the lack of visitation, mother's ongoing communication problems, and A.C.'s outstanding academic performance. The Agency argued under these circumstances, the individuals providing daily care for A.C. should "have some input into her education." A.C.'s counsel agreed that the foster parents should have educational rights and argued that the CASA worker was also willing to hold educational rights, but that mother should not share those rights because of her problems with cooperation. Mother's counsel objected, requesting that mother be allowed to share A.C.'s educational rights. Ultimately, the court determined A.C.'s educational rights would be held by A.C.'s foster parents and CASA worker. However, the court's findings and orders issued after the six-month hearing limited mother's rights as to *both* A.C. and Z.C.

We discern no abuse in the court's decision to limit mother's educational rights to A.C. given the Agency and A.C.'s counsel explanation for limiting those rights.

24

However, the juvenile court's order limiting mother's educational rights as to Z.C. occurred without any discussion at the hearing, any recommendation in the Agency's documents, or otherwise apparent reason why such a limitation was necessary to protect Z.C. or serve his best interests. This was error.

## DISPOSITION

The juvenile court's order limiting mother's educational rights as to Z.C. is reversed with directions for further proceedings to determine whether such limitation is actually necessary. The judgment is otherwise affirmed.

 

 

 

_____

HULL, J.

 

 

We concur:

 

 

_____

BLEASE, Acting P. J.

 

 

_____

RENNER, J.

25